IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ABSOLUTE SOFTWARE, INC. and     §
ABSOLUTE SOFTWARE CORP.,        §
                                §
      Plaintiffs,               §
                                §
v.                              §     CIVIL ACTION NO. H-05-1416
                                §
STEALTH SIGNAL, INC.            §
and COMPUTER SECURITY           §
PRODUCTS, INC.,                 §
                                §
      Defendants.               §
                                §
---------------------------     §
                                §
STEALTH SIGNAL, INC.,           §
                                §
      Counterclaimaint,         §
                                §
v.                              §
                                §
ABSOLUTE SOFTWARE, INC. and     §
ABSOLUTE SOFTWARE CORP.,        §
                                §
      Counterclaim Defendants.  §

MEMORANDUM AND ORDER

Pending are Plaintiffs and Counterclaim Defendants Absolute Software, Inc.'s and Absolute Software Corp.'s Motion for Summary Judgment of Non-Infringement and Invalidity of the Baran Patent (Document No. 221) and Absolute's Cross-Motion for Summary Adjudication of Infringement of U.S. Patent No. 6,507,914 (Document No. 238); and Defendant/Counterclaimant Stealth Signal, Inc.'s Motion for Summary Judgment of Non-Infringement (Document No. 224) and Motion to Strike Absolute's Cross-Motion for Summary Judgment (Document No. 243).   After carefully considering the motions,

responses, replies, and the applicable law, the Court concludes as follows.

## I.   Background

Plaintiffs/Counterclaim Defendants Absolute Software, Inc., and Absolute Software Corp. (collectively, "Absolute"), allege that Defendants Stealth Signal, Inc., and Computer Security Products, Inc. (collectively, "Stealth"), infringe claims of United States Patent No. 6,244,758 (the "'758 Patent"); United States Patent No. 6,300,863 (the "'863 Patent"); and United States Patent No. 6,507,914 (the "'914 Patent"), each of which is assigned to Absolute Software Corp.[1] The '758 Patent, consisting of 75 claims, issued on June 12, 2001. The '863 Patent, consisting of 94 claims, issued on October 9, 2001.  The '914 Patent, consisting of 9 claims, issued on January 14, 2003.  Each of the patents "relates to a security apparatus and method for retrieving lost or stolen electronic devices, such as portable computers." '758 Patent, col. 2, ll. 16-19; '863 Patent, col. 2, ll. 27-31; '914 Patent, col. 2, ll. 9-11.

Stealth counterclaimed, alleging that Absolute infringes claims in United States Patent No. 5,406,269 (the "'269 Patent"). The '269 Patent was issued to David Baran on April 11, 1995.  After Absolute contacted Stealth in August of 2003 asserting that Stealth

_____

[1] Document No. 1 at 3-7.

was infringing Absolute's patents, Stealth searched the prior art, found the '269 Patent, and obtained an exclusive license to it. The '269 Patent generally describes an invention that remotely monitors electronic devices by imbedding in such devices an agent that makes surreptitious calls to a central monitoring site.  '269 Patent, col. 2, ll. 50-59.

Absolute now moves for summary judgment that it does not infringe the '269 Patent and that various claims of the patent are invalid.  Stealth moves for summary judgment that it does not infringe Absolute's '758, '863, or '914 Patents.[2]

## II. Legal Standards

A.   Summary Judgment Standard

Rule 56(c) provides that summary judgment "should be rendered if the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The movant must "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986).

---

[2] The order in which the patents were issued conveniently coincides with the numerical order of the patents' last three digits: '269, '758, '863, '914.

3

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998).  A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice.  Id.  "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."  Id.

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2513 (1986).  All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986).  "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993).  On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." Id. Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." Anderson, 106 S. Ct. at 2513.

4

B.   Infringement Standard

     "The patentee bears the burden of proving infringement by a
preponderance of the evidence."  Laitram Corp. v. Rexnord, Inc.,
939 F.2d 1533, 1535 (Fed. Cir. 1991) (citing Amstar Corp. v.
Envirotech Corp., 823 F.2d 1538, 1545 (Fed. Cir. 1987)).
Determination of infringement is a two-step process: (1) claim
construction, which is a question of law, and (2) a comparison of
the construed claims to the accused product to determine if each
claim element is present, either literally or under the doctrine of
equivalents, which is a question of fact.  IMS Tech., Inc. v. Haas
Automation, Inc., 206 F.3d 1422, 1429 (Fed. Cir. 2000).  The Court
previously adopted Special Master Dr. David B. Johnson's Report and
Recommendation on Claims Construction as modified by his Amendment
to Report and Recommendation on Claims Construction.[3]

     Literal infringement occurs when each properly construed claim
element "reads on," or in other words is found in, the accused
product or method.  Allen Eng'g Corp. v. Bartell Indus., 299 F.3d
1336, 1345 (Fed. Cir. 2002).  On the other hand, "[a] finding of
infringement under the doctrine of equivalents requires a showing

---

     [3] See Document No. 208 (Order on Claims Construction).
Special Master David B. Johnson, Ph.D. in Computer Science, is a
Professor of Computer Science and in Electrical and Computer
Engineering at Rice University.  Prior to joining the faculty at
Rice in 2000, he was a member of the faculty at Carnegie Mellon
University for eight years. See http://www.cs.rice.edu/dbj/bio.html
(last visited July 21, 2010).

that the difference between the claimed invention and the accused product or method was insubstantial or that the accused product or method performs the substantially same function in substantially the same way with substantially the same result as each claim limitation of the patented product or method." AquaTex Indus., Inc. v. Techniche Solutions, 479 F.3d 1320, 1326 (Fed. Cir. 2007). Equivalents are assessed on a limitation-by-limitation basis. Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 117 S. Ct. 1040, 1046-47 (1997). "The question of whether an explicit function has been identified with a claim limitation entails an examination of the claim and the explanation of it found in the written description of the patent." Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc., 141 F.3d 1084, 1090 (Fed. Cir. 1998); *see also* Warner-Jenkinson, 117 S. Ct. at 1054 ("An analysis of the role played by each element in the context of the specific patent claim will thus inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element."). "In other words, if a claim limitation must play a role in the context of the specific claim language, then an accused device which cannot play that role, or which plays a substantially different role, cannot infringe under the doctrine of equivalents." Vehicular Techs., 141 F.3d at 1090.

III.   Absolute's Motion for Summary Judgment of
Non-Infringement and Invalidity of the '269 Patent

A.   "Semi-Random Rate"

Absolute moves for summary judgment that its products do not infringe Claims 12 and 25 (or the claims dependent therefrom) of the '269 Patent because its products do not meet the "semi-random rate" requirement.   Claims 12 and 25 provide that the '269 agent will transmit messages to the central site at a "semi-random rate." Claim 12 of the '269 Patent includes the following:

> [T]ransmission means for initiating, at a *semi-random rate*, the transmission of the message packet from the formatting means to the central site means of the system surreptitiously of a user of said electrical apparatus.

'269 Patent, col. 10, ll. 8-12 (emphasis added).   Claim 25 is a method claim providing:

> [S]aid  remote  site  monitoring  means  initiating transmission, at a *semi-random rate*, of said message packet . . . to the central site monitoring means.

Id., col. 11, ll. 40-43 (emphasis added).   The Court construed "semi-random rate" to mean "normally taking place exactly once at a randomly chosen time during each occurrence of a repeating predetermined time interval."[4]

---

[4] Document No. 208 at 5 (Order on Claims Construction).

Absolute's products are programmed to attempt initiation of a call to Absolute's Monitoring Center exactly 24.5 hours after the end of the last call.[5]   Stealth asserts that fact issues exist regarding whether this design infringes the semi-random rate limitation of Claims 12 and 25 of the '269 Patent, either literally or under the doctrine of equivalents.

### 1.   Literal Infringement

Absolute's products do not literally infringe the semi-random rate element.   First, the transmissions from Absolute's agents to the Monitoring Center are not random.   The Amendment to Report and Recommendation on Claims Construction explains that the '269 Patent is designed to "make 'one, and only one, call during the selected period,'" such as day/week/month, "at a time 'uniformly randomly distributed over the selected time interval.'"[6]   Stealth argues that Absolute's products call once a day:

> For Absolute's products, the 'repeating predetermined time interval' is one day. . . . Within that predetermined time interval--*i.e.*, within each day--the exact *time* when the Absolute software agent calls the Monitoring Center is random. . . . The randomness of the call timing results from the fact that the *end* time of

---

[5] Document No. 242, ex. D-4 at 23 (Gardner Depo.).

[6] Document No. 200 at 20-21 (Am. Report) (quoting '269 Patent, col. 4, ll. 31-40, 48-50) (emphasis added).

each previous session is a variable that is unknown in advance, and may vary, for a number of reasons.[7]

Stealth asserts that two variables "make the precise timing of subsequent scheduled calls unpredictable, and therefore random": (1) the length of a particular call session, and (2) the possibility of a failed call attempt to the Monitoring Center.[8] Stealth describes these variables in the following formula that represents the timing between calls:

(1)   Next_scheduled_Call = End_of_Last_Call_Time + 24.5 hours;

And:

(2)   End_Of_Last_Call_Time = Last_Scheduled_Call_Time + Call_Delay + Session_Duration

Therefore:

(3)   Next_Scheduled_Call_Time = Last_Scheduled_Call_Time + Call_Delay + Session_Duration + 24.5 hours.[9]

Stealth explains:

"Call_Delay" is a random variable because the actual timing of the agent's prior call can be delayed by a number of factors, such as if the agent computer is turned off or the internet is not available to the computer at the time the agent was scheduled to make the previous call. Similarly "Session_Duration" is a random variable that will be impacted by a number of factors,

---

[7] Document No. 242 at 4-5 (emphases in original).

[8] Id. at 5-6.

[9] Id., ex. B ¶13 (Camargo Decl.).

including server traffic and amount of data being transmitted.[10]

Essentially, Stealth argues that the '269 Patent's *randomness* requirement is satisfied by *unpredictability*. However, the invention requires more than mere unpredictability.

First, the '269 Patent is designed to make calls to the central site that are "uniformly randomly distributed over the selected time interval." Uniform random distribution means that the call could occur at any time during the interval.[11] For example, on Day 1 the agent for the '269 Patent could call at 1:00 pm; on Day 2, the agent could call at 8:00 am. Absolute's products, on the other hand, are designed to call 24.5 hours after the last call. This means that when calls are made on consecutive days, the second call will always be at a later time in the day than the first call. For example, if the Absolute agent called at 1:00 pm on Day 1, on Day 2 the agent would call after 1:30 pm.[12]

---

[10] Document No. 242 at 8; *see also* <u>id.</u>, ex. B ¶14 (Camargo Decl.).

[11]    The random number is chosen from a range of numbers that corresponds to the total number of clock time units necessary to cause one output per the selected time period, *e.g.* day/week/month. Thus the triggering time is uniformly randomly distributed over the selected time interval, say one month.

'269 Patent, col. 4, ll. 45-50.

[12] Of course, sometimes calls will not be made on consecutive days, even without delays from call length or session duration: if

Thus, Absolute's products do not make calls at times that are "uniformly randomly distributed" over the selected time interval of a day.

Second, the '269 Patent is designed to make calls "normally . . . *exactly once . . . during each occurrence* of a repeating predetermined time interval."[13]   In the Amendment to Report and Recommendation on Claim Construction, the Special Master added the term "normally" to modify the one-call-per-period requirement to take into consideration two features that could cause this specific timing to vary somewhat.  The first feature is that the '269 Patent provides that a call may be delayed and repeated if the agent cannot connect with the central site.[14]  The second feature is an "emergency interrupt" that makes additional calls when the device being monitored "indicates nonstandard performance."[15]  The Special Master noted, however, that "[e]ach of these features of the invention that may cause the timing of calls to the central site to vary from the normal rate of 'one, and only one, call during the selected period' . . . *do so only in*

---

the call on Day 1 is made at 11:50 pm, the next call will not be made until Day 3 at 12:20 am or later.

[13] Document No. 208 at 5 (Order on Claims Construction).

[14] Document No. 200 at 21 (quoting '269 Patent, col. 4, ll. 55-61).

[15] Id. at 22 (quoting '269 Patent, col. 5, ll. 22-34).

*exceptional conditions.*"[16]  So, absent these exceptional conditions (and assuming that the selected period is one day) the agent for the '269 Patent will make one call per day, *each and every day*.

This limitation does not read on Absolute's products.  Because Absolute's time interval is 24.5 hours, Absolute's products are not intended to call once per day, *each and every day*.  Under entirely normal circumstances, that is, with no "exceptional condition" of a delay (i.e., the Call_Delay variable) and assuming that the preceding call lasted a negligible amount of time (i.e., Session_Duration ≈ 0), Absolute's products may not make any call whatsoever during the occurrence of a predetermined one-day time interval.  For example, if Absolute's product calls on Day 1 at or after 11:30 pm and before midnight, the next call will not occur until Day 3 (sometime at or after midnight and before 12:30 am).  Thus, Absolute's products are not designed to make one call a day under normal circumstances, as Stealth claims.  Accordingly, for both of the foregoing reasons Absolute does not literally infringe Claims 12 and 25 of the '269 Patent, which require calls to be made at a "semi-random rate."

---

[16] <u>Id.</u> at 23 (quoting '269 Patent, col. 4, ll. 33-35, 49-50) (emphasis added).

2.   Doctrine of Equivalents

Absolute also asserts that its products do not infringe the "semi-random rate" limitation under the Doctrine of Equivalents. The "function" of the semi-random rate limitation is described in the '269 Patent's specification:

> The system of the present invention includes a randomizer 10 which determines when the status of the apparatus 18 is to be reported to the Central Site by generating a wake-up signal 12 to activate the monitoring means 14.
>
> . . .
>
> FIG. 2 is a flow chart that is provided to illustrate the operation of the randomizer block 10 in cooperation with selected functions of the other blocks of FIG. 1. Randomizer 10 performs two different functions. *The first is that of a clock to insure that one call per time period, such as day/week/month, is made to the Central Site. Second, that call is made randomly at only one time during that period. The present invention is designed to make one, and only one, call during the selected period* to enable processor 40 to detect situations where more than one system is using the same copy of the software. If more than one system 18 is using software with the same serial number there will be more than one interrogation occurring during that time period.

'269 Patent, col. 3, ll. 45-49, col. 4, ll. 26-40 (emphasis added). The Court, in adopting the Special Master's Amendment to Report and Recommendation on Claims Construction, found that the above description limits the scope of the invention claimed in the '269

13

Patent as a whole, rather than describing just one particular embodiment of it.[17]

The Federal Circuit has held that the function-way-result test focuses on "an examination of the claim and the explanation of it found in the written description of the patent." AquaTex Indus., Inc. v. Techniche Solutions, 479 F.3d 1320, 1326 (Fed. Cir. 2007) (quoting Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc., 141 F.3d 1084, 1090 (Fed. Cir. 1998)).[18]

---

[17] Document No. 200 at 18-21 (Amendment to Report and Recommendation on Claims Construction).

[18] There appears to be some conflict in Federal Circuit case law regarding the extent to which courts should examine the patent's written description when determining the function of certain claim limitations. In Vehicular, the Federal Circuit performed a doctrine of equivalents analysis and derived the functions of the claim explicitly from the specification. See 141 F.3d at 1090-91. In a later case, Toro Co. v. White Consolidated Industries, Inc., the Federal Circuit limited the function of an invention claimed in purely structural terms to the function specifically disclosed in the language of the claim itself. 266 F.3d 1367, 1370-71 (Fed. Cir. 2001). The Toro court described Vehicular as having merely found "non-infringement under the doctrine of equivalents . . . because the accused device lacked a key objective of the invention." Toro, 266 F.3d at 1371 (emphasis added); see also IXYS Corp. v. Advanced Power Tech., Inc., 321 F. Supp. 2d 1133, 1143 n.5 (N.D. Cal. 2004) (finding an "irreconcilable" conflict between Vehicular and Toro and following the decision in Vehicular because it more closely follows the Supreme Court decision in Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 117 S. Ct. 1040, 1054 (1997), and because it was earlier precedent).

Any conflict between Vehicular and Toro is immaterial here. As just discussed, the specification's description of its two functions (quoted above) limits the scope of the invention as a whole. Indeed, the Special Master used this description to define "semi-random rate." These functions are "key objectives" of the invention. See, e.g., Document No. 242 at 14-15 (Stealth's

The first function served by the semi-random rate limitation is to ensure that each device calls during every time interval, and only once during that interval.  The invention of the '269 Patent is designed to monitor the performance of electronic devices and detect software piracy on those devices.  *See* '269 Patent, cols. 1-2.  The semi-random rate requirement allows the central site to detect software piracy, because "[i]f more than one [electronic device] is using software with the same serial number there will be more than one interrogation occurring during that time period." '269 Patent, col. 4, ll. 37-40.  As discussed, the invention deviates from the one-call-per-interval requirement only in "exceptional conditions."  Contrary to Stealth's arguments and as observed above, the evidence establishes that Absolute's products might *not* call every day even under normal (i.e., unexceptional) conditions.  A finding of equivalency would eviscerate the semi-random rate limitation's express requirement that it normally make exactly one call during each time interval, and it would ignore the role played by that requirement.

The second function served by the "semi-random rate" limitation is to prevent a user of the host computer from detecting

---

Response to Absolute's Motion for Summary Judgment of Non-Infringement and Invalidity of the Baran Patent) (noting the two functions of the semi-random rate requirement).

when the agent will make the next call to the central site.[19]   In
an attempt to raise a fact issue, Stealth proffers evidence
that "Absolute's literature makes clear that secrecy, and
undetectability to an unlawful user, are critical functions of the
Absolute software."[20]  The evidence regarding Absolute's promotional
literature *does* establish that Absolute designed its agent to be
difficult to detect; however, there is no evidence that Absolute's
*call timing* furthers the secrecy and undetectability functions.
Rather, the evidence is that Absolute achieves secrecy and
undetectability from characteristics of the agent *itself*, not from
its calling schedule.   Absolute's statements that its agent is
secret and undetectable are given only as part of discussions about
how the agent does not appear on lists of applications running on
the computer.[21]   Stealth's evidence regarding Absolute's method of

---

[19] '269 Patent, col. 6, ll. 30-33, 38-40 ("With any protection
device, there will always be attempts to try to work around it.
Some of the features that can be included in the present invention
to make this more difficult are . . . 2) Schedule the transmissions
to occur randomly--the monitored apparatus shouldn't phone home
every Monday at 8 A.M."); Abstract ("Hardware or software is added
to a local system that has incorporated therewith a modem . . . to
initiate surreptitious calls to report various data to a remote
monitoring station. . . . The call initiation is preferentially
triggered at a carefully controlled semi-random rate, perhaps once
a week.  The exact time chosen is concealed from the operator of
the system that is reporting to the monitoring site.").

[20] Document No. 242 at 13.

[21] *See* id., ex. D-3 at 3-4 (Absolute Software FAQ) ("**Can the
Computrace Agent in LoJack for Laptops be detected?** The Agent is
very difficult to detect.   The software runs as a non-descript
service, and is not listed as an application.  Nor does the product

scheduling calls 24.5 hours after the end of the last call points to only one purpose for that timing: reducing traffic at the Monitoring Center server.  Viewing the evidence in the light most favorable to Stealth, Stealth has failed to raise a genuine issue of material fact that Absolute's products perform a function similar to the "semi-random rate" limitation of Claims 12 and 25 of the '269 Patent.  Accordingly, Absolute is entitled to summary judgment that it does not infringe Claims 12 or 25 of the '269 Patent.[22]

B.    "Terms of Said Usage Agreement"

Claims 11 and 29 of the '269 Patent require that the agent report the "terms of said usage agreement" to the central site.

---

show up on the programs menu listing or as a system tray icon."); ex. D-7 (Computrace Agent FAQs) ("Q: Can ComputracePlus be detected?  A: On most PCs, the Computrace Agent, which powers ComputracePlus, is silent and invisible and will not be detected by looking at the disk directory or running a utility that examines RAM.  On many PCs - depending on their operating system - the agent cannot be erased off the hard drive by deleting files because it is not visible in file directories.").

[22] Because the Court finds that Absolute does not infringe Claim 25 of the '269 Patent, it does not reach Absolute's argument that Claim 25 is invalid for lack of enablement.  *See, e.g.,* Liquid Dynamics v. Vaughan Co., Inc., 355 F.3d 1361, 1371 (Fed. Cir. 2004) ("A district court judge faced with an invalidity counterclaim challenging a patent that it concludes was not infringed may either hear the claim or dismiss it without prejudice, subject to review only for abuse of discretion."); *see also* Cardinal Chem. Co. v. Morton Int'l, Inc., 113 S. Ct. 1967, 1974 n.17 (1993) ("[T]he Declaratory Judgment Act affords the district court some discretion in determining whether or not to exercise that jurisdiction, even when it has been established.").

The Order on Claims Construction provides that "terms of said usage agreement embedded in said software" are: "parameters detailing what is granted by the license agreement for the software, such as the duration or expiration date, number of authorized installations/seats, number of authorized users, or restrictions relating to backup copies of the software."[23]  Stealth argues that Absolute's Computrace agent satisfies this requirement because it reports its Electronic Serial Number ("ESN") to its monitoring center.[24]

Absolute licenses its products to its customers; it has different licenses for different products.[25]  A customer must buy a license for each electronic device that the customer wants Absolute to monitor.[26]  The ESN is a number that "associates each installed agent with the device on which it is installed."[27]  When the Computrace agent is installed in an electronic device, the agent is assigned an ESN.  The ESN is "tied to" the serial number of the electronic device on which it is installed and is

---

[23] Document No. 208 at 5 (Order on Claims Construction).

[24] Document No. 242 at 32-33.

[25] Id., ex. D-8 at ASI1-0004 (Installation and Maintenance of the Computrace Agent Best Practices Guide).

[26] Id., ex. D-8 at ASI1-0004.

[27] Id., ex. D-8 at ASI1-0002.

18

"associated with the product license(s) purchased for each device."[28]

   The ESN is merely a unique number that identifies the customer, the electronic device, and the license corresponding to that device.[29] It is not a statement of "*parameters detailing what is granted* by the license agreement for the software, such as the duration or expiration date, number of authorized installations/ seats, number of authorized users, or restrictions relating to backup copies of the software."[30]   The plain language of the construed claim dictates that the agent must *actually report* these terms, or parameters, to the host, not that it report information which could be used to look up these parameters.   Accordingly, Absolute does not infringe Claims 11 and 29 of the '269 Patent.[31]

---

[28]  Id., ex. D-8 at ASI1-0002.

[29]  Document No. 242 at 28.

[30]  Document No. 208 at 5 (Order on Claims Construction) (emphasis added).

[31]  Stealth has not raised, by argument or evidence, the doctrine of equivalents with respect to the "terms of said usage agreement" limitation in Claims 11 and 29 of the '269 Patent. Absolute moved for "summary judgment of non-infringement," not summary judgment of no literal infringement; it therefore did not restrict its motion to literal infringement only. *See* Am. Seating Co. v. Transp. Seating, Inc., 62 F. App'x 344, 349 n.1 (Fed. Cir. Mar. 26, 2003); *cf. also* Tex. Instruments, Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558, 1566 n.6 (Fed. Cir. 1996) (pre-verdict JMOL motion on issue of "noninfringement" was sufficient to support post-verdict motion concerning noninfringement under doctrine of equivalents); Malta v. Shulmerich Carillons, Inc., 952 F.2d 1320, 1324-25 (Fed. Cir. 1991) (same).  Stealth would bear the burden of proof to show Absolute infringed the '269 Patent under

C.    Invalidity of Claims 1-3, 6-8, and 20

Claims 1 and 20 require a "detection means for comparing the decoded collected data from each remote site means with the expected corresponding data for electrical apparatus of the type in which said remote site means is installed to identify the location of each of said remote site means." '269 Patent, col. 8, ll. 29-35 and col. 10, ll. 60-64.  Claims 2, 3, and 6-8 depend from Claim 1. The Court has previously ruled that "detection means" is a means-plus-function limitation, and that the claims reciting a detection means are "invalid as indefinite under 35 U.S.C. § 112 ¶ 2, for failure to disclose and clearly link any structure to the recited function."[32]  Accordingly, Claims 1-3, 6-8, and 20 are invalid under 35 U.S.C. § 112 ¶ 2.  *See, e.g.*, Halliburton Energy Servs. v. M-I, LLC, 456 F. Supp. 2d 811, 825 (E.D. Tex.

---

the doctrine of equivalents if Stealth had chosen to rely on that doctrine.  *See* Intellicall, Inc. v. Phonometrics, Inc., 952 F.2d 1384, 1389 (Fed. Cir. 1992).  Therefore, in order to survive summary judgment on these claims, it was required to produce evidence of the equivalency of Absolute's products to the "terms of said usage agreement" limitation of Claims 11 and 29 of the '269 Patent.  Id. (discussing Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986)); *see also* Am. Seating, 62 F. App'x at 349 n.1 (if patentee "had a basis for asserting infringement under the doctrine of equivalents, it should have been raised during the  summary judgment proceedings"; instead, patentee argued only that the case turned on claim construction).

[32] Document No. 208 at 13 (Order on Claims Construction); Document No. 177 at 101 (Report and Recommendation on Claims Construction).

2006) (finding independent claims invalid for indefiniteness, and thus, finding their dependent claims also invalid).

IV.  Stealth's Motion for Summary Judgment of Non-Infringement

A.   The '758 and '863 Patents: "Providing . . . Communication Links"

Stealth moves for summary judgment of non-infringement of the asserted claims in the '758 and '863 Patents, asserting it does not literally meet the claimed element of "providing said host system with one or more global network communication links used to enable transmission between said electronic device and said host system . . . ."  This element is present, either directly or by dependence, in all asserted claims of these two patents.  The Court construed this phrase to mean:

> [T]he agent furnishing, supplying, or making available . . . the identification of one or more (perhaps less than all) of the connections (either direct or indirect) between two nodes in the Internet (one of the two nodes may be the electronic device itself) used to enable data transmission between said electronic device and said host system.[33]

Absolute has failed to raise a fact issue to carry its burden to show that this limitation reads on Stealth's product--the XTool Computer Tracker (the "XTool agent").  Absolute's expert explains how the XTool agent functions:

---

[33] Document No. 208 at 3 (Order on Claims Construction).

21

> The XTool agent sends a signal via the internet that
> includes the IP address used to send the signal. . . . In
> addition, all internet communication also includes, at a
> minimum, the IP address of the intended destination of
> the communication, in this case the Stealth Control
> Center.[34]

Therefore, Absolute asserts, the XTool agent sends packets
"contain[ing] both the IP address of the device and IP address of
the Stealth Control Center," which "together comprise one or more
global network communication links."[35]

Absolute's arguments and evidence, however, fail to
demonstrate that the *XTool agent*, as opposed to any other component
of a client device, furnishes, supplies, or makes available any
"global network communication *link*."  Instead, its expert merely
states that the XTool agent identifies the *single* IP address of the
device on which it is installed; he otherwise asserts only that the
"packet, when received by the host system, contains both the IP
address of the device and IP address of the Stealth Control
Center."[36]  This assertion ignores one of the claim's limitations:
that the *agent* must provide the *link*, not merely that the
identification of two nodes comprising a link somehow be present in
the packet ultimately received by the host system.  Viewing the

---

[34] Document No. 238, ex. B ¶¶17-18 (Ennis Decl.).

[35] *See* id. ¶ 18.

[36] Id.

evidence in the light most favorable to Absolute, and accepting its expert's assertion as true, the expert's Declaration supports *only* that the XTool agent identifies a single *node*, not that the agent identifies a *connection between two nodes*.  The foregoing is a distinction specifically made by the Special Master[37] and adopted by the Court in its claims construction.[38]

Absolute has failed to show that the *XTool agent* meets this limitation, which appears either directly or by dependence in all asserted claims of the '758 and '863 Patents.  Stealth is therefore entitled to summary judgment of non-infringement of all asserted claims of the '758 and '863 Patents.  *See, e.g.*, Nomos Corp. v. Brainlab USA, Inc., 357 F.3d 1364, 1367 n.1 (Fed. Cir. 2004) ("Since the failure to meet a single limitation is sufficient to negate infringement of the claim, we will limit our analysis accordingly." (quoting Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533, 1535 (Fed. Cir. 1991))).[39]

---

[37] Document No. 177 at 15-17 (Report and Recommendation on Claim Construction).

[38] Document No. 208 at 2 (Order on Claims Construction).

[39] Just as Stealth did not address, either by argument or evidence, the doctrine of equivalents with respect to the "terms of said usage agreement," Absolute has not pled or argued infringement under the doctrine of equivalents for any limitation at issue in the '758 and '863 Patents.  Stealth's motion, like Absolute's as discussed above, requested "summary judgment of non-infringement," not summary judgment of no literal infringement; it therefore also did not limit its request for relief to literal infringement only. *See supra* note 32.  Like Stealth with respect to its infringement claims, if Absolute "had a basis for asserting infringement under

B.   The '914 Patent: Contacting "Without Signaling"

The computer security monitoring apparatus of independent Claim 4 of the '914 Patent must include agent means "for sending signals to the telecommunication interface including signals for contacting a host monitoring system without signaling the visual or audible user interface" of the computer.[40]   The Court construed "contacting a host monitoring system without signaling the visual or audible user interface" to mean: "getting in touch with or communicating with a host monitoring system without signaling (not necessarily through active suppression) the visual or audible user interface."[41]   Neither party contests that all other elements of asserted Claims 4 and 5 of the '914 Patent read on Stealth's XTool agent.   Absolute asserts that the contacting without signaling element of each claim also reads on the XTool agent, and that the

_____

the doctrine of equivalents, it should have been raised during the summary judgment proceedings." Am. Seating, 62 F. App'x at 349 n.1.  Indeed, in response to Stealth's original motion for summary judgment of non-infringement, Absolute asserted that "the case here" was that the "Court's construction of patent claims will . . . resolve the question of infringement." Document No. 109 at 17 (citing ATD Corp. v. Lydall, Inc., 159 F.3d 534, 540 (Fed. Cir. 1998)).  The Court subsequently construed all disputed claims, after which Absolute has advanced only arguments of literal infringement based upon the claims construction. Cf. Am. Seating, 62 F. App'x at 349 n.1 (patentee's "strategic decision to rely solely on claim construction" belied its argument on appeal "that it had a doctrine of equivalents theory as well").

[40] '914 Patent, col. 627, ll. 22-25.  Claim 5, the only other claim asserted in the '914 Patent, depends from Claim 4.

[41] Document No. 208 at 4 (Order on Claims Construction).

XTool agent therefore infringes the asserted claims of the '914 Patent.[42]   Stealth contends that its agent is distinct because it includes "a step that cause[s] an audible signal to be generated *at the end of a communication* with the host."[43]

 The claim requires that the agent communicate without signaling.   Absolute previously argued that the Court should construe "contacting" to encompass *only* "initiating communication" with the host monitoring system.[44]   That restrictive view of the claim limitation was rejected by the Special Master and by the Court in the Order on Claims Construction.[45]

---

[42] In its motion for summary judgment, Stealth asserted that it did not infringe the '758, '863, or '914 Patents.   Absolute responded to Stealth's motion, and, in that response, cross-moved for summary judgment that Stealth *does* infringe the '914 Patent. Stealth moves to strike Absolute's cross motion for summary judgment because it should have been included in Absolute's original motion for summary judgment filed on September 4, 2009. Document No. 243.   The Scheduling Order dated August 7, 2009, provided:

> Each side [was] permitted *one combined motion*, not to exceed 35 pages in length; and responses shall not exceed 35 pages in length.

Document No. 220 (emphasis added).   Under Rule 16(b)(4), Absolute must show good cause and must obtain the Court's consent to modify the scheduling order.   It has done neither.   Regardless, Stealth's motion to strike is moot in light of Absolute's failure to carry its burden to raise a genuine issue of material fact that Stealth infringes the '914 Patent.

[43] Document No. 224 at 4 (emphasis added).

[44] Document No. 177 at 44 (Report and Recommendation on Claims Construction).

[45] Id. at 44-45; Document No. 208 at 4.

The essence of the argument Absolute now advances is very similar to its claim construction argument: because the XTool agent "establishes a connection" with its host, and "sends and receives information" to and from the host, "all without signaling the visual and audible user interface," the claim limitation reads on the XTool agent.[46] Basically, Absolute's argument has only slightly shifted: instead of just pointing to the absence of a signal to the visual or audible user interface during the transmission of information at the *beginning* of a communication, Absolute now points to the absence of a signal to the visual or audible user interface during *any portion* of the transmission of information during the course of communication. However, this argument ignores the Court's construction, which found "contacting" not to be so restricted.  Just as the Court's construction does not restrict "contacting" to only the initiation of the communication, that construction also does not restrict "contacting" to any particular fragment of the communication.  The requirement of Claim 4 of the '914 Patent is that there must be no signaling the visual or audible user interface when communication is made with a host monitoring system.  This claim does not read on Stealth's XTool agent because upon the occurrence of *every* communication with the host-monitoring system the agent triggers an audible signal at the

---

[46] Document No. 238 at 8.

end of that communication.  Absolute, on the other hand, seems to contend that the XTool agent could avoid meeting this limitation, and thus avoid infringement, only by signaling continuously during *the entire* exchange of information with the host, as any instance in which the agent "sends and receives information" without signaling would meet the limitation.  This does not comport with the Court's construction.

Moreover, as discussed above with respect to the '758 and '863 Patents, Absolute fails to carry its burden to raise a fact issue regarding infringement of this element of the '914 Patent under the doctrine of equivalents, as it neither advances any argument nor points to any evidence establishing equivalency.  Because Absolute has not shown that Stealth's XTool agent meets the claim limitation "without signaling the visual or audible user interface," which appears either directly or by dependence in both asserted claims of the '914 Patent, Stealth is entitled to summary judgment of non-infringement of the '914 Patent.  *See, e.g.*, <u>Nomos Corp.</u>, 357 F.3d at 1367 n.1.


V.   <u>Order</u>


_____For the foregoing reasons, it is

ORDERED that Plaintiffs and Counterclaim Defendants Absolute Software, Inc. and Absolute Software Corporation's Motion for

27

Summary Judgment of Non-Infringement and Invalidity of the Baran Patent (Document No. 221) is GRANTED, and it is ADJUDGED that Absolute's accused products do not infringe U.S. Patent No. 5,406,269 (the "Baran Patent"), and that Claims 1-3, 6-8, and 20 of the Baran Patent are invalid; and Absolute's Cross-Motion for Adjudication of Infringement of U.S. Patent No. 6,507,914 is in all things DENIED; and it is further

ORDERED that Defendant/Counterclaimant Stealth Signal, Inc.'s Motion to Strike Absolute's Cross-Motion for Summary Judgment (Document No. 243) is DENIED as moot; and Defendant/Counterclaimant Stealth Signal, Inc.'s Motion for Summary Judgment of Non-Infringement (Document No. 224) is GRANTED, and it is ADJUDGED that Stealth's accused product does not infringe any of U.S. Patents No. 6,244,758, No. 6,300,863, and No. 6,507,914; and it is further

ORDERED and ADJUDGED that Plaintiffs Absolute Software, Inc. and Absolute Software Corporation, except for the rendition of Declaratory Judgment on the invalidity of Claims 1-3, 6-8, and 20 of the Baran Patent, shall take nothing on their claims against Defendants Stealth Signal, Inc. and Computer Security Products, Inc., and Plaintiffs' cause of action is DISMISSED on the merits; and Counterclaimant Stealth Signal, Inc. shall take nothing on its claims against Counterclaim Defendants Absolute Software, Inc. and

Absolute Software Corp., and Counterclaimant's cause of action is DISMISSED on the merits.

The Clerk will enter this Order and provide a correct copy to all parties.

SIGNED at Houston, Texas, on this <u>21st</u> day of July, 2010.


_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE